UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

IRA JOHN HINES,                                    )
                                                   )
              Plaintiff,                           )
                                                   )
v.                                                 )        No.: 3:10-CV-333
                                                   )            (VARLAN/GUYTON)
TOWN OF VONORE, TOWN OF VONORE                     )
MAYOR LARRY SUMMEY, individually                   )
and in his official and employment capacity,       )
TOWN OF VONORE VICE MAYOR/POLICE                   )
COMMISSIONER JOHN HAMMONTREE,                      )
individually and in his official and               )
employment capacity, TOWN OF VONORE                )
ALDERMAN JAMES "HAMP" BROWN,                       )
individually and in his official and               )
employment capacity, CHIEF OF TOWN OF              )
VONORE POLICE MIKE MYERS,                          )
individually and in his official and               )
employment capacity,                               )
                                                   )
              Defendants.                           )

## MEMORANDUM OPINION

This civil case is before the Court on two motions: a Motion for Summary

Judgment on Behalf of Mike Myers [Doc. 58] filed by former Police Chief Mike Myers

("Myers"); and a separate Motion for Summary Judgment [Doc. 62] filed by the Town of

Vonore ("Vonore"), Vonore Mayor Larry Summey ("Summey"), Alderman and Police

Commissioner John Hammontree ("Hammontree"), and Alderman James Brown

("Brown") (collectively, "Vonore defendants").  Plaintiff submitted responses to both

motions [Docs. 67, 73] to which both sets of defendants submitted replies [Docs. 79, 80].

Both parties have submitted various deposition excerpts and defendant Myers submitted a CD with recordings of several meetings between plaintiff and defendants along with transcripts of those meetings. This Court heard oral argument on the motions on October 22, 2012. The motions are ripe for determination. For the reasons set forth herein, Myers's motion [Doc. 58] and the Vonore defendants' motion [Doc. 62] will both be **GRANTED** to the extent that plaintiff's federal claims will be **DISMISSED WITH PREJUDICE** and because there is no compelling reason to support this Court's continued jurisdiction of plaintiff's remaining state law claims, those claims will be **DISMISSED WITHOUT PREJUDICE** and this case will be **CLOSED**.

## I.     Facts

In September 2009, Summey was elected mayor and defendant Hammontree was elected to be an alderman for the Town of Vonore [Doc. 63 at 3]. At that time, plaintiff was Chief of Police for Vonore, a position which he had held since 2007. Upon taking office, Summey appointed Hammontree to be the Commissioner of the Police Department. As Chief of Police, plaintiff was advised that he was to work directly with Hammontree rather than reporting directly to the mayor [*Id.*].

On October 29, 2009, Summey, along with Hammontree, informed plaintiff that he could resign or be demoted to patrolman, and that he was to be replaced by Myers [*Id.*]. As a result of plaintiff's demotion, among other changes in benefits, plaintiff's pay was reduced to that of a patrolman, $4.00 per hour less than his previous salary [Doc. 25,

¶ 27]. In November of that year, Summey hired Melinda Fowler ("Fowler") to be a School Resource Police Officer [*Id.*].

On January 1, 2010, Summey learned from Fowler's father that Myers allegedly had inappropriate sexual conversations and had otherwise sexually harassed Fowler [Doc. 63 at 3]. After contacting Fowler, Summey requested a meeting for January 5, at which Fowler made a statement regarding the allegations in the presence of Summey and Hammontree. Specifically, the letter alleges one incident where Myers stuck a stick between her legs and rubbing them while she was cleaning [Doc. 62-5]. Myers made a response to Fowler's statement [Doc. 63 at 4]. As a result of the statements and other meetings with Fowler, and because both officers were already on probationary status, Fowler was given 60 additional days of probation, and 90 additional days of probation was given to Myers. Ultimately, Myers was forced to resign because of this incident [*Id.*].

Prior to his resignation, Myers had a departmental meeting on January 2 in which plaintiff was present and which was recorded by plaintiff. Myers discussed vacation time, as well as the need to report matters to him, and to follow "protocol," *i.e.* bringing complaints to him rather than to Summey, Hammontree, or others. [Ex. 7 at 30:45]. At one point Myers informed the officers of the need to follow his orders, and stated that if any of the officers wished to resign they could do so. He specifically asked plaintiff if he wished to resign from the police department [*Id.* at 35:48].

3

On January 8, 2010, plaintiff learned of the allegations of Myers's misconduct from another Vonore police officer, Lieutenant Shane Carr, who had heard about them from Fowler. Later that day plaintiff, Carr, and Fowler met with Tellico Plains Chief of Police Bill Isbell [Doc. 25, ¶ 38]. Isbell contacted the Tennessee Bureau of Investigation as well as the District Attorney [Doc. 1-1 at 2]. Plaintiff was not otherwise involved in reporting the allegations against Myers nor was he involved in any investigation into the matter.

The next day, Saturday January 9, 2010, at approximately 10:00 p.m., plaintiff contacted Hammontree at home requesting a meeting with him [Doc. 58-10 at 2]. Plaintiff informed Hammontree he would come over to his house or that Hammontree could meet him somewhere. The two met in Hammontree's car at a local Shell Station. At that meeting, which was recorded by plaintiff [Doc. 58-10], plaintiff read aloud to Hammontree a three and one-half page, single-spaced letter addressed to Hammontree as well as Summey, Myers, Brown, and Aldermen Mike Garren and David Evans (the "letter") [Doc. 1-2]. Plaintiff had mailed certified copies to those individuals but read the letter to Hammontree while in the car. In the letter itself, plaintiff spends two pages relaying the sequence of events that led to his demotion [*Id.* at 1-2]. Plaintiff also discusses several purported violations of the requirements for officers by the Peace Officer Standards and Training ("POST") Commission [*Id.* at 3]. Plaintiff next alleges that Myers paid an informant for information about him. Most relevant to the present action is plaintiff's second to last paragraph which reads as follows:

4

> I have recently reported criminal offenses conducted by a
> Vonore Police Officer.  I have not investigated these offenses
> and have only fulfilled my statutory duties to report the
> offenses.  I have no further involvement but still fear that my
> job is in jeopardy in spite of the fact that again I know I was
> doing only what was required of me by law.

[*Id.* at 4].  The letter contains no other detail or description of the criminal offenses or to

whom plaintiff is referring to when he mentions a "Vonore Police Officer."  After

reading the letter, plaintiff continued to meet with Hammontree until a little after

midnight.  As indicated by the transcript [Doc. 58-10], at no point did plaintiff discuss the

paragraph pertaining to his reporting criminal offenses.

On the morning of Monday January 11, 2012, Hammontree spoke with Summey

about his meeting with plaintiff that had occurred on Saturday night [Doc. 58-3 at 70].

Hammontree related to Summey that he felt he had no choice but to meet with plaintiff

and that he felt intimidated while meeting with him [*Id.* at 73].  Hammontree gave

Summey his copy of the letter, although Summey had not yet received his own copy in

the mail.  In his deposition, Summey stated that although he looked at the letter and

partially read it, his main concern was the fact that plaintiff had contacted Hammontree to

have this meeting where he read him the letter aloud [*Id.*].  Summey further stated that he

did not recall seeing or discussing the part of the letter describing criminal offenses, nor

did he know to what plaintiff was referring in the letter at the time he first saw it [*Id.* at

77, 103].  Also on that Monday, Summey and Hammontree decided that based on the

events of Saturday night and plaintiff's "erratic manner" they "needed to get rid of"

5

plaintiff [Doc. 99-1 at 172]. Sometime between Monday and Tuesday, January 12, 2010, Hammontree gave Myers a copy of the letter to be put in plaintiff's file, per plaintiff's request. Myers was informed of the decision to terminate plaintiff by Summey, who instructed him to terminate plaintiff the next time he reported to work [*Id.* at 173]. Summey did not seek input from Myers because, as the mayor, only he could terminate plaintiff [*Id.*].

On Tuesday, January 12, plaintiff reported to the police department at around 4:00 p.m. where he was summoned into Myers's office. Myers first rebutted plaintiff's allegation in the letter that he had paid an informant to collect information against him [Doc. 1-3 at 4]. Myers then informed plaintiff that he had violated the "chain of command" Myers had attempted to establish in the January 2 meeting by reading the letter aloud to Hammontree and mailing the letter to the others. Myers informed plaintiff he could either resign or be terminated [Doc. 1-3 at 6]. At that point, plaintiff brought up the allegation of criminal offenses referred to in the letter, specifically stating that he had recently reported criminal offenses that Myers had committed, to which Myers responded he had no idea who plaintiff was talking about in the letter itself [*Id.*]. After stating that he would not resign and that only the mayor had the authority to fire him, Summey was called and he confirmed plaintiff was being fired for "insubordination" [*Id.* at 7].

Plaintiff commenced this action on August 5, 2010 [Doc. 1], originally joined by his wife and child, in which plaintiff alleged nineteen causes of action. In an Order [Doc. 24] filed April 22, 2011, the Court dismissed plaintiff's wife and child as plaintiffs,

6

dismissed Vonore Police Department, dismissed plaintiff's claim of common law retaliation, and held that the Tennessee Constitution does not provide a cause of action for damages. Plaintiff then filed his Amended Complaint [Doc. 25], still alleging nineteen causes of action. These include actions for a violation of plaintiffs' due process rights, a violation of Title VII of the 1964 Civil Rights Act, a violation of the Equal Protection Clause of the Fourteenth Amendment, a violation of plaintiff's First Amendment right of free speech, a general deprivation of civil rights in violation of 42 U.S.C., § 1983, obstruction of justice in violation of 42 U.S.C. § 1985(2),[1] conspiracy to deprive the plaintiff of his rights in violation of 42 U.S.C. § 1985(3), and numerous state claims.[2] Both Myers and the Vonore defendants separately moved for summary judgment on all claims.

## II.     Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact

---

[1] Plaintiff's complaint and defendants' motions mistakenly refer to 42 U.S.C. §1982.

[2] The state claims include a violation of the Tennessee Public Protection Act, violation of the Tennessee Public Employee Political Freedom Act, retaliation in violation of the Tennessee Human Rights Act, aiding and abetting in violation of the Tennessee Human Rights Act, violation of a Vonore Ordinance regarding the right to contact elected officials, violation of the Governmental Tort Liability Act, as well as common law claims of negligence, outrageous conduct, defamation, false light, and negligent hiring and supervision.

7

exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002). "Once the moving party presents evidence sufficient to support a motion under Rule 56, the non-moving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp., Inc.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Catrett*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.* The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a

8

finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III. Analysis

### A. Official Capacity and Individual Liability

In the memorandum to support his motion [Doc. 59], Myers first contends that he should not be sued in his official capacity because a suit against him in his official capacity is the same as a suit against the Town of Vonore.[3]

Pursuant to federal law, a claim against an individual government official is "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, n.55 (1978)). "As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166; *see also Soper v. Hoben*, 195 F.3d 845, 853 (6th Cir. 1999). "It is *not* a suit against the official personally, for the real party in interest is the entity." *Id.* (emphasis in original). Likewise, under Tennessee law, a claim against a government official in his official capacity is construed as a claim against the government entity itself. *See Greenhill v. Carpenter*, 718 S.W.2d 268, 271 (Tenn. Ct. App. 1996) (citing *Cox v. State*, 399 S.W.2d 776, 778 (Tenn. 1965)).

In this case, the Town of Vonore is a named defendant, and thus the suit against the individual defendants in their official capacity is superfluous. Any claim plaintiff has

---

[3] Although the individual Vonore defendants do not make this argument, this analysis applies equally to all of the named individual defendants.

against the individual defendants in their official capacity is treated as a claim against the entity of which the individual defendants are agents. Because the Town of Vonore is a named defendant, the claims against the individual defendants in their official capacities will be dismissed.

## B. Due Process

Although plaintiff makes numerous due process claims, from having a "liberty interest" in his job to having a "liberty interest" in the enforcement of the laws and a liberty interest in not being fired illegally in his amended complaint [Doc. 25, ¶ 58], plaintiff's briefs and oral presentation focused on his property interest in his continued employment with the police department. Both Myers and the Vonore defendants move for dismissal of plaintiff's due process claims, arguing that plaintiff did not have a property interest in his continued employment because Tennessee is an at-will state and Vonore is an at-will employer.

### 1. Vonore

Plaintiff brings a claim pursuant to 42 U.S.C. § 1983 against Vonore for violating his due process rights. Generally, under § 1983 a municipality is liable only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Bennett v. City of Eastpointe* , 410 F.3d 810, 818-19 (6th Cir. 2005) (quoting *Monell*, 436 U.S. at 694. Normally, then, cities are not held accountable for the actions of their agents under § 1983. However, when an allegedly unconstitutional decision is

made by an official with final policy making authority, the municipality may be held liable for that official's decision. *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th 2008).

To assert a valid cause of action under § 1983, a plaintiff must show that "1) [the plaintiff] was deprived of a right secured by the Constitution or laws of the United States and that 2) the deprivation was caused by someone acting under color of state law." *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (quotations omitted).[4] Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere. *Flint v. Ky. Dept. of Corr.*, 270 F.3d 340 (6th Cir. 2001) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985)).

As to the question of whether plaintiff has been deprived of a constitutional right, under the Due Process Clause of the Fourteenth Amendment, "[b]efore a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing." *Bd. of Regents v. Roth*, 408 U.S. 564, 570 n.7 (1972). To establish a procedural due process claim, a plaintiff must show the following: 1) that he had a life, liberty, or property interest protected by the Due Process Clause; 2) that he was deprived of this protected interest; and 3) he was not afforded adequate procedural rights prior to the deprivation. *Albrecht v. Treon*, 617 F.3d 890, 894 (6th Cir. 2010). "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Id.* at

---

[4] The defendants do not argue that they were not acting under color of state law for purposes of § 1983.

569.  In the public employment context, to establish a claim for deprivation of property, a plaintiff "must establish that [he] had a property interest in continued employment with the city." *Brown v. City of Niota*, 214 F.3d 718, 720 (6th Cir. 2000).

> Whether a property interest exists is not determined by reference to the Constitution; rather, property interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 721 (quoting *Ludwig v. Bd. of Trustees*, 123 F.3d 404, 409 (6th Cir. 1997)).  Such independent sources can include state statutes, contractual guarantees, or even agreements "implied from the defendants' words and conduct in light of the surrounding circumstances."  *Woolsey v. Hunt*, 932 F.2d 555, 564 (6th Cir. 1991).  Without such an agreement, a plaintiff's claim turns "'on whether anything in Tennessee statute, common law, or regulation creates [a property] interest" in his continued employment.  *Aldridge v. City of Memphis*, 404 F. App'x 29, 35 (6th Cir. 2010).  It is the plaintiff's burden to establish a property interest.  *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 766 (6th Cir. 2010).  As a starting point, "Tennessee has long recognized the doctrine of employment at will, with the mutual right of either party to terminate such relationship with or without cause." *Brown*, 214 F.3d at 721.

In cases where a plaintiff has alleged discrimination in violation of the Constitution and also in violation of Title VII, as the Sixth Circuit has noted, the remedies set forth by that statute and the more general remedies afforded by § 1983

intersect. *See Toth v. City of Toledo*, No. 11-3075, 2012 WL 1816160, at *2 (6th Cir. May 18, 2012) (slip copy) (discussing the relationship between Title VII and 1983). In *Day v. Wayne County*, a case involving retaliation, the Sixth Circuit held that "Title VII provides the exclusive remedy when the only § 1983 cause of action is based on a violation of Title VII." 749 F.2d 1199, 1204 (6th Cir. 1984); *cf. Grano v. Dept. of Dev.*, 637 F.2d 1073, 1082 (6th Cir. 1980) (holding that when a plaintiff alleges disparate treatment with discriminatory intent under Title VII, she may also recover under § 1983); *Toth*, 2012 WL 1816160, at *3 (noting a claim of discrimination violating the Equal Protection Clause brought under § 1983 is not precluded or otherwise foreclosed by Title VII).

Summey, the mayor of Vonore, terminated plaintiff in this case pursuant to the final authority to do so through the town's charter; therefore, Vonore itself can be liable for his actions. *Arendale*, 519 F.3d at 601. However, to the extent plaintiff alleges a generic cause of action under §1983, defendants are entitled to summary judgment as that statute provides a remedy rather than a right in of itself. Further, while plaintiff argues that he has a due process right in his continued employment, he has presented no evidence to warrant a departure from the default rule of at-will employment recognized in Tennessee and explicitly set forth in the Vonore personnel policy [Doc. 62-1 at 3]. *Cf. Brown*, 214 F.3d at 721 (noting that employee rules and regulations could modify an employment relationship from at-will, but only when there was unequivocal language showing intent to do so). Similarly, plaintiff has not pointed to any language in the

personnel policy or other document stating anything specific about the duration of the employment contract. *See id.* at 722 (citing *Bringle v. Methodist Hosp.*, 701 S.W.2d 622, 625 (Tenn. Ct. App. 1985)) (noting that a contract for an indefinite term is a contract at will).

Plaintiff refers to various state laws that he argues create a property interest in his continued employment although he does not explain how any of them do so [Doc. 73 at 11]. None of the laws referenced modify the default standard of at-will employment, and several merely refer to the general requirements of law enforcement. *See* Tenn. Code Ann. §§ 38-8-105, 38-8-107 (describing the qualifications and certification process for law enforcement officers). Even if these laws could be read to require locales to hire someone who ensures compliance with the state regulations, there is nothing in the law stating that anyone holding that position cannot be terminated and replaced without cause. The mere fact that a position must be filled does not mean that the person who holds that position has more than an at-will employment contract. Plaintiff has not shown that there was "an independent source" to create an expectation of employment as required for a viable due process claim. *Brown,* 214 F.3d at 721.

Plaintiff separately argues that he has a property interest in not being terminated unlawfully, *i.e.* in retaliation for reporting alleged sexual misconduct. Plaintiff contends that Title VII and the Tennessee Human Rights Act "create similar federal 'property' protections in his continued employment" [Doc. 73 at 11]. In other words, plaintiff is claiming that these statutes, which protect him from being fired in retaliation for reporting sexual harassment, give him a property interest in his continued employment that is also protected by the Due Process clause and enforceable by § 1983 [*Id.* at 12]. Plaintiff is thus attempting to invoke the Due Process Clause and use § 1983 to recover for harm that Title VII specifically protects against. This, in effect, leads plaintiff to argue that Title VII grants a constitutional right.

Courts have found that a plaintiff may recover for sex discrimination under both § 1983 and Title VII, because such discrimination is independently prohibited by the Equal Protection Clause. *See Grano,* 637 F.2d at 1081-82; *Day*, 749 F.2d at 1205. But, as the *Day* court held, Congress did not intend retaliation, a violation of Title VII, to be the basis for a § 1983 claim, because it is not an independent constitutional violation. *Day*, 749 F.2d at 1205. Title VII contains its own remedial scheme; absent a separate constitutional violation § 1983 is unnecessary to enforce its protections. Thus, the cases plaintiff cites to, *Grano*, *Demoret v. Zegarelli*, 451 F.3d 140 (2d Cir. 2006), and *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978 (10th Cir. 1991), are inapposite because they all concerned sex discrimination rather than retaliation. By claiming that Title VII creates a due process property interest enforceable via § 1983, plaintiff is making the same

15

argument rejected by the Sixth Circuit in *Day* and undisturbed by *Toth*. 2012 WL 1816160, at *2. Plaintiff has not alleged an independent constitutional violation. He has similarly not shown any statute or agreement that modifies the default rule of at-will employment. Thus, plaintiff's due process claim against Vonore fails as a matter of law and summary judgment will be granted.

## 2. Individual Defendants

Plaintiff also asserts due process claims against the individual defendants. In response, and in addition to the arguments advanced on behalf of Vonore, the individual defendants argue that they are entitled to qualified immunity.

Qualified immunity is an entitlement not to stand trial; it is "an immunity from suit rather than a mere defense to liability, and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1986); *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) (citation omitted). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (citation omitted). "Government officials who perform discretionary functions are generally protected from liability for civil damages as long as their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Holzemer v. City of Memphis*, 621 F.3d 512, 518-19 (6th Cir. 2010) (citations omitted); *Gratsch v. Hamilton Cnty.*, 12 F. App'x 193, 201 (6th Cir. 2001).

16

A three-step analysis is employed by the Sixth Circuit for analyzing claims of qualified immunity. First, a court determines whether, "based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show that a constitutional violation has occurred"; second, a court considers "whether the violation involved a clearly established constitutional right of which a reasonable person would have known"; and third, a court determines "whether the plaintiff has offered sufficient evidence 'to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *Holzemer*, 621 F.3d at 519 (citations omitted). There is no requirement that this inquiry be performed in sequence, *id.* (citation omitted), and if a plaintiff fails to establish any one element, the defendant's request for qualified immunity must be granted. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (citation omitted). In analyzing a summary judgment motion based on qualified immunity, a court must adopt the plaintiff's version of the facts. *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008) (citation omitted). Granting summary judgment on the basis of qualified immunity is inappropriate if there is a factual dispute involving an issue on which the question of immunity turns or if the undisputed facts show that a defendant's conduct did indeed violate clearly established rights. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000) (citations omitted).

Under the first prong of the analysis, plaintiff has not presented any facts that Brown was in any way involved in the decision to fire him, or that he either encouraged, authorized or participated in his termination, which is a prerequisite for § 1983 liability.

17

*Gratsch*, 12 F. App'x at 202.  The other defendants are also entitled to a defense of qualified immunity as a matter of law on plaintiff's due process claim because plaintiff has not presented evidence that he had a property interest in his continued employment with the Vonore Police Department as discussed, *supra*.  Thus, plaintiff's due process claim will be dismissed as to all defendants.

### C.    Title VII

Plaintiff claims that he was fired in retaliation for reporting Myers's sexual harassment and assault against Fowler in the letter, in violation of Title VII.  In response, the Vonore defendants claim that plaintiff has not created a genuine issue of material fact on his Title VII claim because of the ambiguity and vagueness in the letter and that the individual defendants cannot be held liable under Title VII.  Myers also argues that there is no individual liability under Title VII.

Claims for retaliation under Title VII are assessed using the *McDonnell Douglas* burden-shifting framework when there is no direct evidence of retaliation.  *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987).  A *prima facie* case of retaliation requires that: (1) plaintiff was engaged in a protected activity; (2) the person who allegedly retaliated against the plaintiff knew of the exercise of his protected activity; (3) defendant subjected plaintiff to a materially adverse employment action; and (4) there is a causal connection between the adverse employment action and the protected activity.  *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009).  If plaintiff establishes a *prima facie* case of retaliation, the burden shifts to defendant to produce evidence of a legitimate,

18

nondiscriminating reason for its actions. *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 862 (6th Cir. 1997) (citing *Tex. Dep't Commun. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If defendant satisfies this burden, plaintiff must then demonstrate, by a preponderance of the evidence, that the legitimate reason offered by defendant was not its true reason, but was a pretext designed to mask intentional retaliation. *Id.* Furthermore, it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000); *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003). The burden of persuasion remains on the plaintiff throughout even while the burden of production shifts between the parties. *Ladd*, 552 F.3d at 502.

Here, plaintiff has not presented any direct evidence, so the Court must engage in the *McDonnell Douglas* burden-shifting analysis. The Vonore defendants concede that plaintiffs' termination was an adverse employment action, but argue that, as a matter of law, plaintiff cannot meet the other three requirements necessary to meet this burden. Even if he could make out a *prima facie* case, defendants argue that they had a valid reason to terminate him, which was not pretext for retaliation.

### 1. Protected Activity

Title VII protects against retaliation for two different types of activity, the first being "participation in an employer's internal investigation into allegations of discrimination pursuant to a pending EEOC charge." *Abbott*, 348 F.3d at 543 (citing *EEOC v. Total Sys. Serv., Inc.*, 221 F.3d 1171, 1174 n.2 (11th Cir. 2000)). The law also

protects an employee's conduct that represents "opposition to an unlawful employment practice." *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007). The opposition must "concern a violation of a statute." *Id.* Expressions protected by this clause include complaining to anyone about the allegedly unlawful practices and opposing unlawful acts by others, such as co-workers. *Johnson v. Univ. of Cincinnati*, 215 F.3d 587, 591 (6th Cir. 2007). However, "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989). "The distinction between employee activities protected by the participation clause and those protected by the opposition clause is significant because federal courts have generally granted less protection for opposition than for participation in enforcement proceedings." *Id.* at 1312.

Here, plaintiff was not engaged in any formal investigation at the time he wrote the letter to defendants, as he admitted in the letter itself [Doc. 1-2 at 4]. Plaintiff's protected activity does not fall under the participation wing of Title VII and he can only go forward on the less protected opposition clause of the statute.

As for plaintiff's opposition to an employer's unlawful practice, plaintiff's argument is that the second-to-last paragraph in his January 9 letter constitutes protected activity under Title VII. Construing this paragraph as a complaint or opposition, it is not even a "vague charge of discrimination" or other violation of Title VII; it is not a charge at all. *Booker*, 879 F.2d at 1313. Plaintiff's opposition is ambiguous not only as to the

20

nature of the unlawful practice but also as to who committed the unlawful practice. Plaintiff states only that he had "recently reported criminal offenses conducted by a Vonore Police Officer" [Doc. 1-2 at 4]. The phrase "criminal offense" does not refer to any violation of Title VII (which is not, in and of itself, a criminal offense) or any specific conduct. "Police officer" does nothing to identify Myers as the person reported. Summey stated in deposition testimony that at the time he first read the letter he did not know what plaintiff was talking about [Doc. 62-4 at 103]. Plaintiff has not argued that the protected activity was going to Isbell; rather his argument is focused on the letter.

### 2. Knowledge

A "necessary element of the *prima facie* case is that the official committing the adverse action have knowledge of the protected activities." *Brown v. City of Franklin*, 430 F. App'x. 382, 386 (6th Cir. 2011). *See, e.g., Childs v. Motor City Casino Hotel*, No. 09-13108, 2010 WL 6562439, at *8 (E.D. Mich. Oct. 5, 2010) (finding it was impossible to demonstrate causation where adverse employment action preceded filing of the charge). Summary judgment is appropriate, then, when the plaintiff fails to "produce any direct or circumstantial evidence from which a reasonable jury could infer that [defendants] knew or were aware of his protected activity." *Mulhall v. Ashcroft*, 287 F.3d 543 (2002).

Plaintiff argues that the knowledge requirement has been met because of Hammontree's lack of reaction when plaintiff read his letter aloud to Hammontree. Plaintiff's reasoning is as follows: a) because Hammontree did not react to plaintiff's

letter when he read it aloud to him, referring to the criminal offenses; and b) a person who would hear about a police officer committing a criminal offense would ask more questions/show more reaction; thus c) Hammontree knew not only to whom plaintiff was referring to but also about what plaintiff was referring to. Plaintiff also argues that Myers knew that the letter referred to him prior to the termination meeting, but the transcript shows that plaintiff told Myers, after he had informed plaintiff of the decision to terminate him, that the accusation was against him [Doc. 58-9 at 6]. As previously noted, in his deposition, Summey testified that he had no idea to what plaintiff was referring in the letter when it mentioned "criminal offenses."

Plaintiff has not presented any evidence that Isbell or any of the other parties involved went to defendants to inform them that plaintiff had come to them about the alleged sexual misconduct. Plaintiff has not presented any evidence that defendants were aware of plaintiff's knowledge of the alleged misconduct prior to the termination hearing. The fact that they were independently aware of Fowler's allegations against Myers does not alleviate the requirement that defendants must know *plaintiff* was engaging in protected activity. All plaintiff offers to show knowledge are "conspiratorial theories, not the specific facts required under" Rule 56. *Mulhall*, 287 F.3d at 552 (citing *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc) (finding summary judgment appropriate where inferences were akin to "flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from [personal]

experience")).  Even construing the facts in plaintiff's favor, he cannot meet the second *McDonnell Douglas* requirement.

### 3.    Causal Connection

As to what constitutes a causal connection, the Sixth Circuit has stated that a plaintiff must "'proffer evidence sufficient to raise the inference that [her] protected activity was the likely reason for the adverse action.'"    *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010) (quoting *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009)).  While close proximity of time may be one indicator of a causal connection, *id.*, it has been observed that "temporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007).   "Where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality."  *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (citing *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 364-65 (6th Cir. 2001)).  Other cases, however, suggest that where an adverse action occurs very close in time after an employer learns of a protected activity, temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation.  *Mickey*, 516 F.3d at 525.

Here, plaintiff was terminated four days after he first learned of the allegations against Myers and took Fowler to Police Chief Isbell, three days after he read his letter

aloud to Hammontree, and one day after Summey received the letter and heard about the incident with Hammontree [Doc. 62-4 at 9]. The proximity in time between the events of reporting the alleged sexual misconduct and termination is an indication that there may be a connection, but there is little "other evidence" to establish causality, particularly in light of there being no evidence defendants had knowledge that plaintiff was reporting sexual misconduct. *Mickey*, 516 F.3d at 525. The letter that plaintiff claims contained reports of sexual misconduct also contained numerous other complaints, and the material that could be construed as a report of sexual misconduct is not only vague but also takes up only two lines of a four-page letter [Doc. 1-2 at 4]. The manner in which plaintiff spoke to Hammontree and the sending of the letter to the mayor and others was contrary to the reporting procedure for grievances and "protocol" that Myers had attempted to implement at the January 2, 2010 meeting [Ex. 7 at 30:45]. This affirmative evidence against a causal connection outweighs the impact of temporal proximity alone.

### 4. Non-discriminatory Reason and Pretext

Assuming that plaintiff could present a question of fact to the jury regarding his prima facie case, defendants can show that there was a non-discriminatory reason and plaintiff cannot show that the proffered reason was mere pretext so that his complaint fails as a matter of law. *See Ladd*, 552 F.3d at 502 ("We need not address whether [plaintiff] made out her prima facie case, because she has failed to produce any evidence that [defendant]'s decision was mere pretext and has therefore failed to carry her burden of persuasion . . .".).

A plaintiff may establish pretext by showing that the reason given for the adverse action "1) had no basis in fact, 2) did not actually motivate the challenged conduct, or 3) is insufficient to explain the challenged conduct." *Upshaw*, 576 F.3d at 586; *Ladd*, 552 F.3d at 502 (stating employee "must produce evidence" of pretext to survive a motion for summary judgment). "Plaintiffs must produce sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Upshaw*, 576 F.3d at 586. It is insufficient that the reason given was erroneous. *Id.*; *Majewski v. Auto. Dating Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("As long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual because it is ultimately shown to be incorrect."). Looking at similarly situated employees is relevant in an inquiry into "the employer's 'motivation and intent' to determine whether the employer was 'motivated by retaliation.'" *Ladd*, 552 F.3d at 503 (quoting *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987)).

Here, defendants' proffered reason for terminating plaintiff was his disregard of the police force's established reporting procedure by confronting Hammontree and sending the letters to the others. With regard to the first method by which plaintiff could show pretext, defendants' proffered reason does have sufficient basis in fact. First, as plaintiff admits in the letter, he was informed while he was still Police Chief that Hammontree was going to be the liaison between the police department and the mayor and that he was to relay anything to the mayor through Hammontree [Doc. 1-2 at 1].

Later, at the departmental meeting on January 2, Myers instructed the department as to "protocol" and the manner in which members of the police department were to report complaints or other matters [Ex. 7 at 30:45]. In reading the letter aloud to Hammontree, plaintiff bypassed Myers, and although including him in the letter, further bypassed him by sending copies to all of the elected officials of Vonore. Officer Fowler, who gave much more detail about the alleged misconduct than plaintiff and actually gave a statement concerning Myers, was not terminated for her actions, which also shows that defendants' "motivation" was not related to plaintiff's vague report of a police officer's criminal offenses but rather his violation of the police force's established reporting procedure. Plaintiff's claims pertaining to Title VII present no question for which a reasonable jury could grant relief, thus summary judgment for all defendants is appropriate.[5]

## D. Equal Protection

### 1. Town of Vonore

In employment discrimination claims brought under §1983 as a violation of the Equal Protection Clause, the Sixth Circuit "applies the familiar *McDonnell Douglas* framework applicable in similar cases brought under Title VII." *Arendale*, 519 F.3d at

---

[5] Plaintiff concedes that there is no individual liability under Title VII for damages, but submits that the individual defendants should remain parties for injunctive purposes. In *Wathen v. General Electric*, 115 F.3d 400 (6th Cir. 1997), the court discussed that the remedies by provided by Title VII, including reinstatement and back-pay, indicated that Congress intended only to include employers as defendants. *Id.* at 406. Accordingly, plaintiff's Title VII claim may be maintained only against Vonore, as the town itself would be responsible for carrying out any injunction issued by the Court.

26

603 (citing *Weberg v. Franks*, 229 F.3d 415, 522 (6th Cir. 2000)). The four requirements for a *prima facie* case are that the plaintiff: "1) is a member of a protected class; 2) was qualified for the job; 3) suffered an adverse employment decision; and 4) was replaced by a person outside of the protected class or treated differently than similarly situated non-protected employees." *Id.* The Supreme Court has also recognized that plaintiffs may assert an equal protection claim without membership in a protected group or suspect class, "'where [they] allege[] that [they have] been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Aldridge*, 404 F. App'x at 42 (alterations in original) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). This type of equal protection claim is referred to as a "class-of-one claim." *Id.*; *see, e.g. Aureus Holdings, Inc. v. Detroit City*, 303 F. App'x 265, 269 (6th Cir. 2008) (affirming district court's ruling where plaintiff failed to point to evidence that could support a "class of one" claim).

However, the Supreme Court, in *Engquist v. Oregon Department of Agriculture*, held that "the class-of-one theory of equal protection does not apply in the public employment context." 553 U.S. 591, 598 (2008). The Court found that the class-of-one idea was inconsistent with the notion of at-will employment and that government employment, by its nature, involves "discretionary decision-making based on a vast array of subjective, individualized assessments." *Id.* at 603.

Plaintiff has not asserted that he is a member of a protected class; rather plaintiff argues that he was "intentionally treated differently from others similarly situated," namely, the other Vonore police officers. *Aldridge*, 404 F. App'x at 42. Accordingly, plaintiff's claim is best characterized as a "class of one" equal protection claim. *Aureus*, 303 F. App'x at 269. This means that plaintiff's claim fails in light of the *Engquist* decision. As a member of the police department, plaintiff was subject to the exact "discretionary decision-making" that the *Engquist* court held made the "class-of-one" theory a "poor fit in the public employment context." 553 U.S. at 605. The Vonore personnel policy explicitly stated the city was an at-will employer. Coupling this with the *Engquist* court's reasoning that "an at will government employee . . . generally has no claim based on the Constitution at all," it is appropriate to deny plaintiff's claim here when he is an at-will public employee and not a member of a protected class. *Id.* at 606 (quoting *Waters v. Churchill*, 522 U.S. 661, 679 (1994). *See also Blank v. Benzie Cnty. Bd. of Comm'rs*, No. 1:10-CV-201, 2012 WL 1084571 (W.D. Mich. Mar. 30, 2012) (finding decision not to provide supplement retirement benefits as outside "the ambit of the Equal Protection Clause" because of discretionary nature of public employment); *O'Brien v. City of Saginaw*, No. 10-12700-BC, 2011 WL 3799649, at *6 (E.D. Mich. Aug. 26, 2011) (dismissing equal protection claim of terminated public employee in light of *Engquist*). However, even without *Engquist*, plaintiff's claim would fail because he cannot show that he was treated differently than others similarly situated.

Many of the events on which plaintiff bases his equal protection claim, including his reduction in pay, his loss of a high badge/radio number, and change in the shift rotation, occurred not as an intentional act of discrimination but merely because he was no longer serving as Chief of Police after his demotion. As plaintiff admits in his own depositions, he received the same pay as every patrol officer, plaintiff's previous badge/radio number was reserved for the Chief of Police, and the shift rotation affected everyone [Doc. 58-1 at 263].

Plaintiff's central claim is that he was terminated and that Myers and Fowler were not, arguing that the three were similarly situated. However, plaintiff was not similarly situated to either of these individuals. Myers and plaintiff were not similarly situated because Myers was in a position of authority relative to plaintiff. Myers was interviewed and submitted a statement during the course of Summey's informal investigation. He was ultimately forced to resign because of the misconduct against Fowler. Fowler, the only recipient of any misconduct by Myers, reported what happened at the request of Summey, and gave much more detail about what allegedly happened than plaintiff's vague references in his letter. She was actually involved in the underlying incidents, but only spoke about them once approached by Summey; she did not write a letter to all the town's elected officials. Plaintiff did not give specific details in his letter and not until after he was informed of his termination, and he was the only one to be terminated for violating the protocol Myers had attempted to establish. Plaintiff has therefore not

29

presented someone with whom he was similarly situated for equal protection purposes and Vonore is thus entitled to summary judgment on plaintiff's equal protection claim.

### 2.      Individual Defendants

The individual defendants raise the defense of qualified immunity to plaintiff's equal protection claim as they did to his due process claim.   As previously stated, plaintiff bears the burden of showing a constitutional violation, whether the violation involved a clearly established constitutional right of which a reasonable person would have known; and whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of these rights. *Holzemer*, 621 F.3d at 519 (citations omitted).   Again, this analysis is unnecessary for defendant Brown as he was not involved in any of the adverse decisions plaintiff cites to in his complaint.

For the same reasons Vonore is not liable under § 1983 for violating the Equal Protection Clause as discussed, *supra*, the individual defendants are entitled to summary judgment as well because plaintiff has not shown that a constitutional violation occurred.

### E.      First Amendment

### 1.      Vonore

Plaintiff claims that he was fired in retaliation for his meeting with Hammontree and the letter that he read to him and mailed to the other city officials.   Defendants move for summary judgment, arguing that plaintiff was fired not for the content of his speech but the manner in which he presented it.

30

"[I]n determining whether a public employer has violated the First Amendment by firing a public employee for engaging in speech, the Supreme Court has set out a three-step inquiry.  First a court must ascertain whether the relevant speech addressed a matter of public concern."  *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180 (6th Cir. 2008) (quotations omitted).  As this prong is a question of law, the court must assess "the content, form and context" of the statement.  *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 143 (1983)).  A court must also determine whether the employee's expressions were made "pursuant to his or her official responsibilities" or were made outside of those duties.  *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006).  Matters of public concern "include speech that relates to any matter of political, social, or other concern to the community."  *Rodgers*, 344 F.3d at 596 (internal quotations omitted).  "'[I]nternal personnel disputes or complaints about an employer's performance' do not touch upon a matter of concern."  *Id.* (quoting *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001)).  An employee's motivation underlying his speech is a relevant but not necessarily dispositive factor.  *Bonnell v. Lorenzo*, 241 F.3d 800, 812 (6th Cir. 2001).  Further, the employee's entire speech does not have to focus on matters of public concern, as long as some portion of the speech does so.  *Id.*  Thus, "mixed speech" is still subject to First Amendment protection.  *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 894 (6th Cir. 2003).

Second, the court must "balance the interests of the public employee, as citizen, in commenting upon matters of public concern and the interest of the State, as employer, in promoting the efficiency of public services it performs through its employees." *Hughes*, 542 F.3d at 180-81 (quotations omitted) (noting that the decision maker must reach its conclusion in good faith and not as a pretext). This includes considering "'whether an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, [or] impair discipline by superiors . . .'." *Rodgers*, 344 F.3d at 601 (quoting *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994)). Relevant factors include "the manner, time, and place of the employee's expression, as well as the context in which the dispute arose." *Id.* The second prong is also a question of law, with defendant bearing the burden of demonstrating that there were legitimate grounds for the termination. *Hughes,* 542 F.3d at 181.

Third, the court must determine whether the employee's speech was a substantial or motivating factor in the employer's decision. *Id.* While "[u]sually the question of causation is a factual issue to be resolved by a jury . . . [n]onetheless, a court may grant summary judgment even in a causation inquiry, where it is warranted." *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996) (citing *Langford v. Lane*, 921 F.2d 677, 683 (6th Cir. 1991)).

In this case, for two pages plaintiff outlines his interactions with Summey and Hammontree from the time they took office until his demotion. On the third page, plaintiff reports and goes through several alleged POST violations. Plaintiff states that he feels obligated to report these violations because of his position as General Departmental Instructor. The letter also discusses allegations that Myers is collecting information against plaintiff. As previously noted, in the final two paragraphs of the four-page letter, plaintiff discusses alleged criminal violations of a Vonore police officer. This letter, then, and plaintiff's subsequent reading of it to Hammontree, represents "mixed speech." Plaintiff's motivation, from the record before the Court, is both personal, in voicing concerns that he has been ignored or otherwise mistreated, and public, in ensuring that the police department is complying with the relevant POST regulations. *See Banks*, 330 F.3d at 895 (finding both a personal and public motivation behind employee's speech). Plaintiff's report on his dealings with Hammontree and Summey or his allegations that Myers is collecting information about him are not matters of public concern, but reporting that criminal activity has been committed by a police officer is a matter of public concern, however vague that report may be. Similarly, plaintiff's descriptions of POST violations represent a matter of public concern. Thus, plaintiff has met the first requirement for a First Amendment retaliation claim.

Turning to the second factor, plaintiff and the public do have a vested interest in making sure the police department is operating in accordance with the relevant laws and regulations governing it. However, one must fit this interest into the "time, manner, and

place" of plaintiff's expression. *Rodgers*, 344 F.3d at 601. Plaintiff did not just write a letter to Hammontree, Summey, and the other officials. Plaintiff called Hammontree, a part-time government official, at 10:00 p.m. on a Saturday night on his home phone and asked to meet with him either at his residence or out on the road [Doc. 58-10 at 3]. In the letter itself, plaintiff makes numerous references to the fact that Hammontree and Summey ignored or were dishonest with him in the period of time leading up to his demotion [Doc. 1-1 at 1-2]. He also accuses the Chief of Police, his replacement, of paying off someone to gain harmful information about him [*Id.* at 3]. Throughout plaintiff' meeting with Hammontree, plaintiff repeatedly made references to Myers's investigating him [Doc. 58-10 at 35] and admonished Hammontree for not knowing more about what he alleged Myers was doing [*Id.* at. 79]. The fact that the bulk of the letter and what he spent a majority of the time speaking about in the meeting related only to his own complaints indicates that the impetus for the meeting that night was plaintiff's personal interests. While not dispositive, this weighs against a finding that his interest outweighs Vonore's interest. In addition, by meeting with Hammontree and sending the letter, plaintiff disrupted the reporting protocol Myers had tried to establish one week earlier. There is nothing in the record to show that Summey's decision to terminate plaintiff, even if viewed as incorrect, was made in bad faith or that the reason given for that decision, plaintiff's insubordination, was pretext. *Hughes*, 542 F.3d at 180-81.

Given the circumstances in this case, the Court also looks to whether the speech was a substantial or motivating factor in plaintiff's termination and finds that it was not. Plaintiff alleges that he was fired for reporting the criminal offenses and POST violations in the letter. However, as discussed in the analysis pertaining to the causal connection under Title VII, *supra*, plaintiff's actions must be viewed in context. Plaintiff asked Hammontree for a meeting and wrote this letter one week after Myers had tried to establish a reporting protocol for the police department, just as Summey had tried to establish a protocol with plaintiff while he was still chief of police. This was the basis for plaintiff's termination. As discussed by plaintiff, Myers, and Summey during his termination meeting:

> Mr. Summey: Okay. Due to our conversation with (inaudible) I had instructed the Chief to terminate you on insubordination charges there over that letter.
> Mr. Hines: Yes, sir. May I ask what was insubordinate about in sending the letter to all members?
> Mr. Summey: The Chief will explain it to you.
> . . . .
> Mr. Myers: Of course you very well know that's (inaudible) chain of command (inaudible)

[Doc. 1-3 at 8]. The record shows that, even assuming Summey did actually read plaintiff's letter, the letter itself was not what led him to the decision to terminate plaintiff; rather it was the meeting with Hammontree. This becomes more evident given the fact that Hammontree recounted the meeting to Summey as being more confrontational or hostile that Monday morning than it may have actually been, as noted by Summey in his deposition testimony.

35

Q: When you saw the letter, did you first talk to Commissioner Hammontree or did he just hand you the letter and you read the letter? Tell me what you recall about that.
A: He just said John called him out.

. . . .

Q: What did Commissioner Hammontree tell you about that? Did he give you any explanation?
A: He said that they had him scared and tried to intimidate him.

. . . .

I just – I really didn't – can't tell you much of what was in that letter.
Q: Did you read the letter?
A: Partially.
Q: Did you read – I'm talking about that Monday morning.
A: Oh. I looked at it.

. . . .

A: Being concerned with what had transpired that Friday [*sic*] night, it wasn't so much that I was concerned what was in the letter, it was the demeanor of what went on.

. . . .

A: No, actually I was – I try not to get excited, I guess you used to call it furious. I was really, let's say, exceedingly concerned when I found out about what had transpired during Saturday night, and it wasn't the first time that John [Hammontree] had been trying to be intimidated [*sic*] and he had been scared of the police department.

[Doc. 62-4 at 72-74, 103]. From this un-contradicted testimony, the record confirms that at the time Summey made the decision to terminate plaintiff, even construing all doubt in plaintiff's favor, the letter was not the underlying reason for his decision but rather his confrontation with Hammontree that Saturday night and the manner in which it was portrayed to Summey, in light of other problems brought to Summey's attention. From this, and in light of the three requirements to set out a First Amendment claim, plaintiff has not raised a triable question of fact as to whether his right of free speech was violated.

36

## 2. Individual Defendants

As with plaintiff's other constitutional claims, defendants claim they are entitled to qualified immunity for his First Amendment claim. As to defendant Brown, summary judgment is proper because plaintiff has again alleged no facts in the complaint against this defendant relative to his termination. For the reasons set forth, *supra*, plaintiff has not set forth a material issue of fact for a jury on whether he was fired in retaliation for his First Amendment exercise of free speech, thus the other defendants are entitled to qualified immunity and summary judgment is proper as to all defendants.

## F. 42 U.S.C. § 1985

Section 1985 provides a cause of action for conspiracies to deprive individuals of their civil rights. Specifically, the statute makes liable any two or more persons conspiring to deter, by force, intimidation or threat, any party from testifying in court or being involved in an indictment, or to hinder or obstruct the "due course of justice" with the "intent to deny any citizen the equal protection of the laws." 42 U.S.C. § 1985(2). The statute similarly makes damages available against those who conspire to deny any person or persons the equal protection of the laws. 42 U.S.C. § 1985(3).

To support a viable claim under 42 U.S.C. § 1985(3), a plaintiff must show the following: "1) a conspiracy involving two or more persons; 2) for the purpose of depriving a person or class of persons of the equal protection of the laws; and 3) an act in furtherance of the conspiracy; 4) which causes . . . a deprivation of a right or privilege." *Johnson v. Hill & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994). Plaintiff must

37

also establish that the conspiracy was "motivated by a class-based animus." *Id.* To sustain an action under 42 U.S.C. § 1985(3), a plaintiff must prove the existence of a conspiracy among 'two or more persons.'" *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991).

> It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.

*Id.* This is the underlying rationale of the "intra-corporate conspiracy" theory. Under this doctrine, there is no conspiracy liability when the claim is based upon the interactions of two or more agents of the same entity. *Id.* at 510; *see also Upton v. City of Royal Oak*, No. 10-2304, 2012 WL 12662024, at *11 (6th Cir. May 11, 2012) ("This court has adopted the general rule in civil conspiracy cases that a corporation cannot conspire with its own agents or employees."). This doctrine applies to both government entities and corporations. *Brace v. Ohio State Univ.*, 866 F. Supp. 1069, 1075 (S.D. Ohio 1994). The Sixth Circuit has recognized an exception to this general rule in holding that "an intra-corporate conspiracy may be established where individual defendants are also named and those defendants act outside the scope of their employment for personal reasons." *Johnson*, 40 F.3d at 840 (quoting *Garza v. City of Omaha*, 814 F.2d 553, 556 (8th Cir. 1987)). *But see Irons v. City of Bolivar*, No. 1:11-cv-01369-JDB-egb, 2012 WL 4829185, at *2 (W.D. Tenn. Sept. 28, 2012) (finding that exception did not apply where plaintiff, terminated from his position as Police Chief, "fail[ed] to present facts

38

demonstrating that his termination was anything more than an internal corporate decision, which would almost always be within the scope of employment").

In this case, both of plaintiff's § 1985 conspiracy claims fail as a matter of law. First, plaintiff cannot show that defendants intended to prevent him from being part of any formal investigation or other proceeding. Plaintiff has presented no evidence that defendants were aware that plaintiff had gone to others about the alleged misconduct, much less that they prevented him from doing so. Second, plaintiff cannot show that his termination was done with the intent of depriving him of his civil rights. As explained*, supra*, plaintiff had no constitutional right in his employment, nor was he the target of any actions motivated by class-based animus. *See Johnson v. Anderson*, No. 2:07-CV-161, 2008 WL 4093352, at *7 (E.D. Tenn. Aug. 28, 2008) (granting summary judgment when there were "no facts set forth in the complaint to support the *conclusory* claim that the defendants conspired to deprive plaintiffs of their civil rights" (emphasis in original)).

Even if plaintiff could make out a conspiracy claim under either section of 1985, these defendants would fall under the intra-corporate conspiracy doctrine. While plaintiff asserts that there was personal motivation on the part of defendants, he has presented no evidence to substantiate this assertion, nor any evidence to show that defendants acted outside the scope of their employment against him. In fact, the record shows that Summey specifically acted within the scope of his employment. *See Irons*, 2012 WL 4829185, at *2 ("Because the power to fire the police chief fell within the Mayor's authority . . . the alleged conduct did not fall outside of the scope of the [d]efendants'

39

employment."). The facts of *Irons* are similar to those present here in that both involved law enforcement officers alleging a conspiracy against the city employees involved in their termination but with no proof that this was done for personal reasons. In light of *Irons*, and in light of the record, plaintiff's claims must fail as falling under the intra-corporate conspiracy doctrine. Summary judgment is appropriate as to all defendants for plaintiff's claims under 42 U.S.C. § 1985.

### G.      Plaintiff's State Law Claims

Plaintiff alleges numerous violations of Tennessee statutory law as well as state tort claims. The Court's analysis of plaintiff's federal civil rights and Title VII claims, however, effectively disposes those claims of which this Court has original jurisdiction. While the Court has broad discretion under 28 U.S.C. § 1367(c)(3) to dismiss or to retain jurisdiction over pendent state law claims under these circumstances, "the usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment." *Thacker v. Lawrence Cnty.*, 182 F. App'x 464, 472 (6th Cir. 2006) (quoting *Brandenburg*, 253 F.3d 891 at 900). *See, e.g., Jackson v. Town of Caryville, Tenn.*, Nos. 3:10-CV-153, 3:10-CV-240, 2011 WL 5143057, at *10 (E.D. Tenn. Oct. 28, 2011). Thus, pursuant to § 1367(c), and in the exercise of its discretion and in the interests of comity, the Court will decline to exercise continuing "pendent" or supplemental jurisdiction over plaintiff's remaining state law claims. 28 U.S.C. § 1367(c); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725-26 (1966);

*Brandenburg*, 253 F.3d at 900.  As no compelling facts support this Court's continued jurisdiction of plaintiff's remaining state law claims, those will be dismissed as well.

## IV.    Conclusion

For the reasons stated herein, the Motion for Summary Judgment on Behalf of Mike Myers [Doc. 58] and the Motion for Summary Judgment [Doc. 62] by the Vonore defendants will be **GRANTED** to the extent that the Court finds summary judgment in favor of all defendants appropriate as to all of plaintiff's federal civil rights claims brought pursuant to 42 U.S.C. §§ 1983 and 1985 in violation of the First and Fourteenth Amendments and brought under Title VII of the 1964 Civil Rights Act.  Plaintiff's federal causes of action are **DISMISSED WITH PREJUDICE** and plaintiff's state causes of action are **DISMISSED WITHOUT PREJUDICE**.  There being no other issues in this case, the Court will **DIRECT** the Clerk of Court to **CLOSE** this case.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan_____
CHIEF UNITED STATES DISTRICT JUDGE